J-A04043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.M.K., MOTHER | : | |
| | : | |
| | : | No. 1384 MDA 2024 |

Appeal from the Order Entered August 19, 2024
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000239-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.K., MOTHER | : | |
| | : | |
| | : | No. 1385 MDA 2024 |

Appeal from the Order Entered August 19, 2024
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000240-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: E.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.K., MOTHER | : | |
| | : | |
| | : | No. 1386 MDA 2024 |

Appeal from the Order Entered August 19, 2024
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000241-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: N.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.K., MOTHER | : : : : : : | |
| | : | No. 1387 MDA 2024 |

Appeal from the Order Entered August 19, 2024
In the Court of Common Pleas of York County
Juvenile Division at No(s):  CP-67-DP-0000071-2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.J.R.G., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.M.K., MOTHER | : : : : : : | |
| | : | No. 1404 MDA 2024 |

Appeal from the Decree Entered August 19, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2024-0086a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.J.H., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.M.K., MOTHER | : : : : : : | |
| | : | No. 1405 MDA 2024 |

Appeal from the Decree Entered August 19, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2024-0084a

- 2 -

J-A04043-25

| IN RE: ADOPTION OF: E.D.-M.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.M.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1406 MDA 2024 |

Appeal from the Decree Entered August 19, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2024-0085a

| IN RE: ADOPTION OF: N.E.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.M.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1407 MDA 2024 |

Appeal from the Decree Entered August 19, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2024-0087a

BEFORE: LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED: APRIL 9, 2025**

B.M.K. ("Mother") appeals from the orders changing the permanency placement goals from reunification to adoption with respect to her daughters, J.J.R.G. (born October 2021), A.J.H. (born October 2017), and E.D.-M.K. (born December 2020), and her son, N.E.R. (born February 2023) (collectively, "the Children"). Mother also appeals from the decrees

- 3 -

involuntarily terminating her parental rights to the Children.[1]  Upon careful review, we affirm the involuntary termination decrees and dismiss the appeals from the goal change orders as moot.

The record reveals the following facts and procedural history.  On November 1, 2022, the juvenile court placed Mother's three daughters[2] in the emergency protective custody of York County Office of Children, Youth, & Families ("CYF") due to allegations that Mother left one-year-old J.J.R.G. unattended in a bathtub with running water until the child was fully submerged and drowning.  *See* Orphans' Court Opinion, 10/17/14, at 2.  Following a hearing one week later, Mother's daughters were placed in shelter care; on November 29, 2022, the court adjudicated them dependent.  *See id*. at 2-3.

The court found the incident with J.J.R.G. was the *sixteenth* referral CYF had received regarding this family.  *See* Order of Adjudication and Disposition, 11/29/22, at 1.  CYF received a referral only several weeks before that incident alleging Mother had neglected then two-year-old E.D.-M.K., who was observed walking in the street in traffic without supervision.  *See id*. at 2.  At that time, Mother was under criminal investigation for endangering the welfare of a child due to the incident described above with J.J.R.G.; she was

---

[1] The Children have different natural fathers.  The court involuntarily terminated the parental rights of the Children's fathers and Mother in the same decrees.  None of the Children's fathers have filed a notice of appeal from the involuntary termination decree or the goal change order concerning their child.

[2] Mother's son, her youngest child, had not yet been born.

subsequently charged with a felony. Mother was also the subject of three misdemeanor charges arising from a car accident on July 30, 2022, when one of her daughters was in the car with her. *See id*. at 2.

With respect to the incident with J.J.R.G., Mother eventually pled guilty to a misdemeanor and received a term of probation of two to four years. *See* Permanency Review Order, 12/16/24, at 2. Mother was also sentenced to an unspecified term of probation in the case involving the motor vehicle accident.

Mother's son, N.E.R., was placed in emergency protective custody a few days after his birth in February 2023. The court subsequently placed N.E.R. in shelter care and adjudicated him dependent in March 2023. N.E.R. was placed in the same pre-adoptive foster home as his two half-sisters, J.J.R.G. and E.D.-M.K. *See* N.T., 8/16/24, at 127. A.J.H., the oldest child, has resided in a pre-adoptive foster home with her paternal grandmother throughout this case.

The juvenile court held both permanency review and status review hearings regularly, during which the court continually rated Mother's progress in alleviating the circumstances that necessitated the Children's placement as "minimal." *See* Orphan's Court Opinion, 10/17/24, at 3-4. Specifically, the court consistently found that Mother did not properly supervise the Children, which placed their safety at risk. *See id*.

On May 16, 2024, when Mother's three daughters had been in placement for eighteen months, and her son for his whole life of fifteen months, CYF filed

separate petitions requesting a change in the Children's goals from reunification to goals concurrently listed as adoption and placement with a non-relative legal custodian. On the same date, CYF filed petitions for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3]

The court conducted a consolidated evidentiary hearing on the goal change and involuntary termination petitions in August 2024.[4] Shaina Wright ("Wright"), the family's CYF caseworker from the start of this case through the time of the hearing, testified the Children's permanency placement goal had been reunification with a concurrent goal of adoption. *See* N.T., 8/16/24, at 82. Wright testified Mother's service plan goals were to participate in parenting classes and supervised visitation with the Children. *See id*. at 75-76, 85. In addition, Mother was required to address mental health concerns related to her history of diagnoses including attention deficit hyperactivity disorder and/or bipolar disorder. *See id*. at 85, 122.

---

[3] For purposes of the contested involuntary termination proceeding, the Orphans' Court appointed four attorneys, one for each of the Children, to represent their separate legal interests. *See* Orders Appointing Legal Counsel, 5/21/24. In doing so, the court complied with 23 Pa.C.S.A. § 2313(a). *See In re Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017). In addition, the Children's best interests were represented by a single guardian *ad litem* ("GAL") during the proceeding. *See* N.T., 8/16/24, at 4.

[4] One month before the hearing Mother was charged with two new criminal offenses: retail theft and driving without a license. *See* N.T., 8/16/24, at 89-90.

- 6 -

David Kasberg ("Kasberg"), a family advocate at Catholic Charities Intensive Family Services testified he was assigned to assist Mother with her goals, from January 2023, until the date of the hearing. *See id*. at 10-11. Kasberg testified he assisted Mother with using the skills she learned in the parenting program during supervised visitation. *See id*. Kasberg testified Mother never progressed beyond supervised visitation in his eighteen months of supervision. *See id*. at 12, 20, 30-31.

Kasberg testified that he oversaw Mother's supervised visits, once per week for three consecutive hours with the younger three children only, and an additional two hours every week with all four children including A.J.H. *See id*. at 13. Kasberg explained the supervised visits are scheduled that way because A.J.H. "compounds [the] behaviors with the other children," and acts inappropriately to obtain Mother's attention. *Id*. at 54-55.

Concerning Mother's progress in alleviating the circumstances that caused the Children's placement, Kasberg testified that she seemed to understand the lessons taught in the parenting program, and she attempted to utilize them during supervised visits. *See id*. at 35-36. However, Kasberg testified that he still needs to "prompt" Mother during visits regarding proper handling of the Children. *Id*. at 53.[5]

---

[5] Kasberg testified Mother's recognition he was prompting her constituted a level of relative improvement: "in the past[,] she did not necessarily recognize what my intention was, but now we're at the point where [M]other
*(Footnote Continued Next Page)*

Kasberg testified Mother continues to be unable to provide for the Children's safety during visits. He gave the following example of a park visit that occurred the day before the hearing:[6]

> [J.J.R.G.] ran out of the park towards the parking lot approximately four times during the visit, and [I] and my colleague had to chase after h[er] and physically redirect h[er], *i.e.*, pick h[er] up and bring h[er] back to a safe location.
>
> Also[,] during the visitation [J.J.R.G.] ran out of the actual fenced-in playground region towards the swing sets. Mom went to go supervise h[er], and I stayed behind with [A.J.H.], [E.D.-M.K.], and [N.E.R.] and supervised them while my colleague and [Mother] went to go supervise [J.J.R.G.].
>
> So[,] the safety concern would be that at this point in the case from our perspective, [M]other is not able to efficiently maintain or manage all of the [C]hildren in a community environment.

N.T., 8/16/24, at 17.

Kasberg clarified that he requests double staffing at visits when A.J.H. is in attendance with the younger three children and when they occur in the community. *See id*. at 18-19. Regarding to the issues caused by A.J.H.'s presence with the other children, Kasberg explained:

> [A.J.H.] is sensitive at times. And if she does not feel that she is getting enough attention, she will engage in behaviors such as crawling under a table or hiding behind an object and crying until mom then goes to her and consoles her. [I]t happens about once or twice a visit I would say, so fairly regularly.

---

is aware that it is a prompt for her to re-engage with the [C]hildren." *Id*. at 53-54.

[6] At the time, A.J.H. was six years old; E.D.-M.K. was three years old; J.J.R.G. was two years old; and N.E.R. was fifteen months old.

* * * * *

The other children take notice of it . . . .. They more or less continue playing or engaging in their activities while [M]other then gives most of her attention to assisting [A.J.H.].

* * * * *

I definitely stop taking my notes and simply just observe the kids and supervise them when [Mother] goes off with [A.J.H.] so I can give them a more full level of supervision.

*Id*. at 56-57.[7]

Kasberg testified Mother is only capable of managing the Children in a "very controlled environment," which exists in the office's visitation room. **See** *id*. at 46. He explained that the room is small, and when the door is closed, there are no safety concerns, and Mother does not need his "redirection." *Id*. at 46-47. Kasberg testified another professional might benefit Mother and he was looking to terminate his participation with the designation of the case as an "unsuccessful closure." *Id*. at 34-35.

Wright testified A.J.H. participated in supervised visitation with Mother to provide "extra therapeutic support" during a six-month period. *Id*. at 105. Wright testified that the younger three children, who reside together in the same pre-adoptive foster home, view their foster parents as the parental figures in their lives. *Id*. at 118-119. Moreover, she testified that is in the

_____

[7] Kasberg also testified not-yet-seven-year-old A.J.H. at times assists Mother by volunteering to change diapers and supervising one of the other children, and he believed she was relied on to do so when the family lived together. **See** *id*. at 68-69.

Children's best interest that Mother's rights be terminated "due to the safety concerns" because Mother "has not shown that she's able to actively manage all the kids together." *Id*. at 133. Wright testified A.J.H. has "an unhealthy bond" with Mother which manifests in A.J.H.'s "negative emotions related to the dynamics of their relationship." *Id.* at 132. Those dynamics, she explained, are based on A.J.H. taking on "more of a role as a helper to [Mother]." *Id*. at 115. Kasberg confirmed that, during supervised visits, A.J.H. displays "parentified behavior in assisting [M]other essentially parent the younger three children." *Id*. at 66.

Wright testified A.J.H. has a healthier bond with her paternal grandmother: "I believe [Grandmother's] style of parenting may be more equipped for [A.J.H.] in that she is more of an assertive, stern parent. . .. For [A.J.H.], I think that is something that she needs." *Id.* at 117-118. Wright testified ultimately that A.J.H. "views" her paternal grandmother, who desires to adopt her, "as her parental figure." *Id*. at 118.

At the conclusion of the hearing, the court granted CYF's petitions. On August 19, 2024, the court entered the goal change orders and the involuntary termination decrees on the respective dockets.

Mother timely filed separate notices of appeal from the goal change orders and the involuntary termination decrees, in addition to separate concise statements of errors complained of on appeal, pursuant to Pa.R.A.P.

J-A04043-25

1925(a)(2)(i) and (b). This Court consolidated the appeals *sua sponte*. On October 17, 2024, the Orphans' Court filed its Rule 1925(a) opinion.

On appeal, Mother presents the following issues for review:

I.   Whether the [Orphans'] [C]ourt erred by concluding a change in the permanency goal from reunification to adoption would be be[s]t suited for the needs and welfare of the [C]hild[ren?]

II.  Whether the [Orphans'] [C]ourt erred in terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) of the Adoption Act[?]

   a) The evidence did not support by clear and convincing evidence that Mother had evidenced a settled purpose of relinquishing parental claim to the [C]hild[ren] or has refused or failed to perform parental duties.

   b) The evidence did not support by clear and convincing evidence that there had been continued incapacity, abuse, neglect, or refusal of the parent which has caused the [C]hild[ren] to be without essential parental care, control, and subsistence.

   c) The evidence did not support by clear and convincing evidence that Mother cannot or will not remedy the conditions within a reasonable period of time.

   d) The evidence did not support by clear and convincing evidence that the conditions which led to the removal or placement of the [C]hild[ren] continues to exist and termination of the parental rights would best serve the needs and welfare of the Children.

III. Whether the [Orphans'] [C]ourt erred in concluding that termination of parental rights would best serve the needs and welfare of the Child[ren] pursuant to Section 2511(b) of the Adoption Act[?]

Mother's Brief at 5-6 (punctuation standardized).[8]

We begin by reviewing the involuntary termination decrees, and we do so according to an abuse of discretion standard, as follows.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.  This Court has explained:

> Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination.  In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing or best interest approach.  If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare.

---

[8] The GAL filed a brief advocating in favor of this Court affirming the goal change orders and involuntary termination decrees with respect to the Children.  None of the attorneys representing the Children's legal interests filed briefs in this appeal.

*In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (internal quotation marks and citations omitted).

The moving party must establish the statutory grounds under both section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id*. (citation omitted). This Court will affirm an involuntary termination decree if we agree with the determination of the orphans' court regarding any one subsection of section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Section 2511(a)(8) and (b) provides as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * * * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * * * *

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

- 13 -

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).[9]

We first consider section 2511(a)(8), which this Court has explained includes the following three elements that a petitioner must satisfy:

(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child.

*In re M.E.*, 283 A.3d at 832 (citation omitted). Further, as we have explained, unlike other subsections, section 2511(a)(8)

does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. The relevant inquiry regarding the second prong of § 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing. Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, any efforts by the parent to remedy the conditions described in the petition which are first initiated subsequent to the giving of notice of the filing of the petition.

Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically accounts for the needs of the child. This Court has recognized that the application of § 2511(a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children. However, by allowing for

_____

[9] This Court shall affirm an involuntary termination decree if we agree with the determination of the orphans' court regarding any one subsection of section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

- 14 -

termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re M.E.*, 283 A.3d at 832 (internal citations, brackets, and quotation marks omitted, paragraphing altered).

Mother acknowledges the Children "came into care due to imminent risk of harm and lack of supervision." Mother's Brief at 53. She similarly acknowledges that "the safety concern is of [her] inability to manage all of the [C]hildren." *See id*. at 59. She attempts to differentiate between her ability to keep the Children individually safe from imminent risk of harm with her ability to manage them collectively and asserts the only concern regarding her ability to keep them from imminent risk related to J.J.R.G., whom she had left unattended in the bathtub. *See id.* Further, Mother argues that the court abused its discretion because she made progress in her permanency goals and "showed growth in dealing with" the Children. *Id*.

The Orphans' Court found the concerns about the Children's safety continued concern from the time of the near drowning, at every visit when all four children were present, and through the interaction at the park the day before the hearing. *See* Orphans' Court Opinion, 10/27/24, at 8.

- 15 -

Although the court recognized Mother had made some progress, it found "as it relates to fundamental safety in supervision, especially with all four children, she was unable to perform a basic parental duty, despite the passage of over a year and a half and after having considerable interventions." *See id*. at 9. The court lamented that Mother tried hard but fell short and concluded, "Mother, on her own and with her circumstances and skill set, simply could not manage with the four children and was not going to be able to do so in a reasonable timeframe." *Id*. The law compelled the court "to provide [the] [C]hildren with permanency rather than having them languish in foster care with an uncertain future." *Id*. at 10. *See id*. at 14 (stating "[t]he inescapable truth is Mother has not shown that she has the ability to handle all four Children and to keep them safe").[10]

We find no abuse of discretion in the Orphans' Court's finding. Mother's commendable efforts cannot override the Children's need for safety and permanency, particularly after more than one year in care and with no signs the conditions that led to placement would change. Mother was shown to be unable to collectively manage the Children and keep them safe; therefore, reunification of Mother and the Children was not imminent at the time of the

---

[10] The court also explained that, if the Children were returned to Mother, "they would only have her to rely on regularly and if her attention were to fail at another crucial time, they would be put in the same jeopardy as [J.J.R.G.]. *Id*. at 14.

hearing. ***See In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009); N.T., 8/16/24, at 124 (Wright's testimony Mother is not "in a position today to obtain physical custody" of the Children).

Similarly, the record supports the Orphans' Court's determination termination of parental rights would best serve the needs and welfare of the Children. As noted, both Wright's and Kasberg's testimony showed A.J.H. has "an unhealthy bond" with Mother, in which she is more a helper than a child, and A.J.H. has a healthier bond with her paternal grandmother. Ms. Wright testified ultimately that A.J.H. "views" her paternal grandmother, who desires to adopt her, "as her parental figure." ***Id.*** at 118. Moreover, Wright testified that termination was in all the Children's best interests. Mother's claim thus fails.

Mother's second claim asserts the court abused its discretion in finding the evidence met subsection (b)'s requirements because the Children "share a strong bond" with her, and it "would be harmful" to them to sever it. Mother's Brief at 62.

Section 2511(b) mandates that the "primary consideration" for a court in considering an involuntary termination petition be to the child's "developmental, physical and emotional needs and welfare." ***Interest of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023; ***see also*** 23 Pa.C.S.A. § 2511(b). This Court has repeatedly stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the

child." ***In re C.W.U., Jr.***, 33 A.3d 1, 6 (Pa. Super. 2011) (citation omitted). The child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***K.T.***, 296 A.3d at 1109. The K.T. Court also emphasized the court must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. ***K.T.***, ***supra***.

A Section (b) analysis also evaluates the Children's current living, and caregiver, situation: "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." ***In re T.S.M.***, 71 A.3d at 268. In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id***. at 269.

The Orphans' Court found that termination was in the Children's best interests:

> The court has had this case for almost two years, and Mother has not been able to alleviate the court's safety concerns to the degree that there could be unsupervised visits with the Children. Even if Mother's rights had not been terminated, there would still be a

- 18 -

long uncertain road ahead to move past just the supervision stage of these dependency cases and into unsupervised visits and then reunification. When a case has been open for so many months and into years, the court must give the children in the dependency case a more certain future. The needs and welfare of children include a need for permanency and stability. Indefinite drift through the foster care system does not serve the Children's needs and welfare, and foster care is all the younger children really know. It is time for them to have permanent homes so that they can move forward.

Trial Court Opinion, 10/17/24, at 15.[11]

We discern no abuse of discretion by the Orphans' Court in terminating Mother's parental rights pursuant to Section 2511(b). In one-and-one-half years Mother never progressed to unsupervised visits due to her inability to ensure the Children's safety. The court was well within its discretion to favor the Children's need for permanency after eighteen months and fifteen months, respectively, in placement. With respect to the younger three children, Kasberg testified that they enjoy seeing Mother at the visits, but there is no record evidence that they suffer distress on leaving the visits and returning to their foster parents, and Wright testified the Children have a stronger bond with their foster parents than with Mother. N.E.R., the youngest child, has been in placement since birth. This claim does not merit relief.

Finally, Mother argues that the court abused its discretion in changing the Children's permanency placement goals. However, because we affirm the

---

[11] **See also** Orphans' Court's Opinion at 19 (expressing respect for Mother's efforts but declaring them "simply . . . not enough to guarantee the safety of these four Children").

- 19 -

decrees involuntarily terminating Mother's parental rights to the Children, her appeal from the goal change orders is moot. *See Interest of A.R.*, 11 A.3d 1105, 1114 (Pa. Super. 2023) (concluding that appeal from goal change order is moot given the termination of parental rights). Therefore, we do not consider Mother's argument.

Decrees affirmed. Appeal from goal change orders dismissed as moot. Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/09/2025